**BERGMANN v. UNITED STATES.**

No. 10387.

Circuit Court of Appeals, Ninth Circuit.

June 26, 1944.

---

Walhfred Jacobson, of Long Beach, Cal., for appellant.

Charles H. Carr, U. S. Atty., and James L. Crawford and Wm. W. Worthington, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before WILBUR, DENMAN, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Appeal by Friedrich Walter Bergmann from a decree of the district court declaring null and void and cancelling a certificate of naturalization theretofore granted appellant upon the ground that the certificate was fraudulently obtained. The case was tried exclusively upon this issue of fraud.

The certificate of naturalization was granted under the Naturalization Law of 1906, 34 Stat. 596, as amended. The action by the government to annul the decree and cancel the certificate was begun, the hearing thereon was held, and the judgment of cancellation and nullification was made and entered after the effective date of the Act of 1940. 8 U.S.C.A. § 738. The fact that the naturalization judgment was made while the act of 1906 was effective and that its cancellation was ordered after the 1940 act had become effective is treated as of some importance in an amicus curiae brief. We dispose of the case without the necessity of considering the point made.

Appellant was born in Germany on March 6, 1893, and entered the United States in July, 1922. He filed his petition for naturalization November 5, 1936 and was admitted to citizenship April 9, 1937. On July 3, 1942, the District Attorney filed an affidavit in the district court in which several alleged causes for the revocation of the decree of naturalization were stated[1] and upon the same date filed a complaint in that court alleging that the certificate of naturalization was obtained illegally and fraudulently and praying that it be declared null and void and that it be cancelled. It is alleged in the complaint that appellant's assertions of attachment to the principles of the Constitution in his petition for naturalization and by his oath of allegiance were false and fraudulent and that he did not in good faith intend to renounce allegiance to the German Reich and that he did not intend to reside permanently in the United States, and further that he did not intend to support the Constitution and laws of the United States of America against all enemies foreign and domestic, nor to bear true faith and allegiance to the same, that in fact he did intend to remain a subject of the German Reich and to maintain his allegiance thereto, and that his certificate of naturalization was procured by appellant by the fraudulent and illegal means referred to for the purpose of obtaining the rights and

---

[1] This affidavit required by 8 U.S.C.A. § 738 (referred to generally in the cited opinion as "§ 15") was not mentioned in the record as originally certified to this court, but by a supplement to the record it appears that the required affidavit was duly made and filed. In an amicus curiæ brief it is contended that this affidavit is

privileges and protection of American citizenship without intending to assume the duties thereof.

Appellant denies in the answer all of the allegations of the complaint set out therein as cause for cancellation of his naturalization certificate and alleges: That he left Germany in January, 1911, en route to Canada, where he resided until July, 1922, at which time he left to enter the United States; that during his Canadian residence he was law-abiding; that he came to Long Beach, California, in 1923, where he has resided ever since; that in 1930, 1931 and part of 1932 he was in Hawaii on two archeological exploration expeditions; that during 1932, 1933 and 1934, while on two archeological excursions he spent a part of his time in French Oceania and British Cook Island; that he has never revisited Germany where his mother and aunt live, and he has no other known relatives or interest there; that he loves America, owns property in Long Beach, California, and has purchased United States defense bonds; that he has willed the Los Angeles County Museum a valuable collection of shells and has willed seventy-five percent of his properties to Long Beach, California, and Toronto, Canada, Y.M.C.A.; that he has never belonged to a Bund or similar organization, is a loyal United States citizen and is willing and would be proud to serve the "country of his adoption with all of his time, talents, property and life"; that he has never performed military service for the German Reich or its predecessors; that he left Germany to avoid compulsory military service and has always opposed German military and autocratic policies; that he is attached to the principles of the United States of America, the Declaration of Independence, the United States Courts, and the Gettysburg Address; that he has continuously devoted himself to the duty of a citizen and has given no allegiance to any other than the United States of America. There was testimony relevant to the proof of these allegations.

The evidence reveals that a number of neighbors, associates and acquaintances of appellant testified to statements they say were made by appellant some three years after the issuance of his certificate of naturalization. These statements referred in vile terms to the President of the United States and severely condemned the present national administration and the institution of democracy. The statements indicated hatred of the Jews and contempt of Americans. The witnesses further testified as to appellant's remarks that America was a good place to make money, that Hitler and the Nazi policies were commendable, and that the Japanese were "nice people" who *had* to make the attack upon Pearl Harbor. There is testimony that appellant had been seen to give the Heil Hitler salute, that he approved of Hitler and Nazism, and that he expressed delight over the sinking of the British capital ships Repulse and Prince of Wales.[2] In addition to these statements, the government introduced the original of appellant's questionnaire filled out prior to the court hearing upon petition for naturalization. This shows an answer crossed out and answered another way, and the naturalization officer testified in regard thereto.

The preliminary petition or application for naturalization was dated August 28, 1936, and citizenship was granted April 9, 1937. The questionnaire, which is a part of the petition or application, consists in part of printed questions with a blank left for answers. Among the questions, with the answers written in ink, are the following:

22. "Do you understand the principles of government of the United States?" Ans. "Yes."

23. "Do you fully believe in the form of government of the United States?" Ans. "Yes."

25. Under this number the oath of Allegiance is printed immediately after which the question is asked: "Are you willing to take this oath in becoming a citizen?" Ans. "Yes, with greatest sincerity."

26. "If necessary, are you willing to take up arms in defense of this country?" To this question appellant first wrote "Yes." After some discussion with the naturalization officer he caused the follow-

jurisdictional and was never filed. The point is not in this case, but see Schwinn v. United States, 9 Cir., 112 F.2d 74, affirmed 311 U.S. 616, 61 S.Ct. 70, 85 L. Ed. 390.

[2] These ships were sunk December 10, 1941. The United States declared war on Japan December 8, 1941, and on Germany December 11, 1941. It is evident that at the time the ships were sunk, the United States was not technically at war with Germany.

ing to be written in the blank: "but will not take up arms in an attack upon Germany." The official said that statement would result in his being denied citizenship. After reflecting for fifteen minutes, he had the qualifying remarks stricken, explaining, "I then and there changed my mind."

The official attending Mr. Bergmann in the naturalization office testified that Bergmann said he had no objections to bearing arms in defense of the United States, but he would not bear arms in an attack upon Germany, and this was not because of religious belief. Bergmann further told the official that he could not take the oath without the qualification he had made to question 26 and that it would be hard for him to bear arms in an attack upon Germany.

After the qualifying answer to question 26 had been withdrawn, and some time later after an unqualifiedly favorable report upon him by an officer of the naturalization bureau had been made, appellant appeared before the court with a number of others and took the required oath of allegiance.

On June 12, 1944, the Supreme Court of the United States decided the case of Baumgartner v. United States, 64 S.Ct. 1240, reversing a decision of the Circuit Court of Appeals, 8 Cir., 138 F.2d 29, which latter court had affirmed the judgment of the District Court, 47 F.Supp. 622, in cancelling Baumgartner's certificate of naturalization upon the ground that it had been procured by fraud. The cited case and the instant case run parallel. In the cited case Baumgartner was extremely critical of President Roosevelt and of the national administrative policies. His statements were that he admired Hitler and the Nazi program. He indulged in Hitlerian racial prejudices, and kept a diary in which he had made many entries of pro-German sentiment. His wife and daughter were in Germany, and he said with sarcastic or ironical meaning, that is to say, with his tongue in his cheek [64 S.Ct. 1243]: "Edith has done a very un-American thing, she has joined the Nazi Youth Movement." He said "he would be glad to live under the regime of Hitler."

■ Having compared the record in the instant case with the statement of fact in the Baumgartner case, we have no hesitancy in saying that Baumgartner's conduct after he had obtained his citizenship was much more critical of America and much more praiseful of Germany than Bergmann's after his certificate had been granted.

■ The incident of the questionnaire is, however, a distinguishing feature for the reason that it does not relate to conduct after the citizenship had been acquired but before and as a part of the road leading to citizenship. There are at least two entertainable lines of thought in regard to this incident. Standing alone, with no subsequent expressions of a questionable loyal character, it might well be found that the strong ties of blood and fatherland drew irresistably upon appellant when first he was confronted with the necessity of declaring that he would or would not fight against his relatives and his native land. It is not unreasonable to assume that the mental struggle, hard as it probably was, finally ended in his resolution to go the whole way. The rebuttable presumption that a person tells the truth aids this view.

The expression used by Bergmann to the official that it would be hard for him to bear arms in an attack upon Germany may be argued in support of this view, but it is also reasonably arguable that Bergmann expressed his real sentiments in suggesting the limitations made in the answer to question 26 but that after a quarter hour of reflection yielded to the temptation to falsify the answer by striking the limitations.

We are cognizant of the fact that we are a reviewing court and not a trial court and that there are strong limitations upon our actions. The Supreme Court of the United States was careful in the Baumgartner case, supra, to recognize these limitations and went to great pains to distinguish the differences in consideration of the usual case and one touching the civil rights of a citizen wherein the proof, to prevail against the citizen, must be clear, unequivocal, and convincing. We quote liberally from the main opinion in that case.

"The phrase 'finding of fact' may be a summary characterization of complicated factors of varying significance for judgment. Such a 'finding of fact' may be the ultimate judgment on a mass of details involving not merely an assessment of the trustworthiness of witnesses but other appropriate inferences that may be drawn from living testimony which elude print. The conclusiveness of a 'finding of fact' depends on the nature of the materials on

which the finding is based. The finding even of a so-called 'subsidiary fact' may be a more or less difficult process varying according to the simplicity or subtlety of the type of 'fact' in controversy. Finding so-called ultimate 'facts' more clearly implies the application of standards of law. And so the 'finding of fact' * * * may go beyond the determination that should not be set aside here. Though labeled 'finding of fact', it may involve the very basis on which judgment of fallible evidence is to be made. Thus, the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes consideration by this Court. See, e. g., Beyer v. Le Fevre, 186 U.S. 114, 22 S. Ct. 765, 46 L.Ed. 1080. Particularly is this so where a decision here for review cannot escape broadly social judgments—judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship. Deference properly due to the findings of a lower court does not preclude the review here of such judgments. This recognized scope of appellate review is usually differentiated from review of ordinary questions of fact by being called review of a question of law, but that is often not an illuminating test and is never self-executing. Suffice it to say that emphasis on the importance of 'clear, unequivocal, and convincing' proof, see Schneiderman v. United States, supra, 320 U.S. at page 125, 63 S. Ct. at page 1336, 87 L.Ed. 1796, on which to rest the cancellation of a certificate of naturalization would be lost if the ascertainment by the lower courts whether that exacting standard of proof had been satisfied on the whole record were to be deemed a 'fact' of the same order as all other 'facts,' not open to review here."

■ Thus, as we see it, the Supreme Court is holding that whether or not the proof in a denaturalization case has met the test—"clear, unequivocal, and convincing"—is in a sense a question of fact itself and not a mere expression of the yard stick used by the trial court in determining the ultimate fact. When it looked for evidence in the Baumgartner case, which could be held as clear, unequivocal, and convincing, the court said: "We cannot escape the conviction that the case made out by the Government lacks that solidity of proof which leaves no troubling doubt in deciding a question of such gravity as is implied in an attempt to reduce a person to the status of alien from that of citizen."

The test pronounced by the Supreme Court when applied to the testimony regarding Bergmann's conduct since his certificate of citizenship issued, leaves the government's case weaker, in our opinion, than that in the cited case.

If one could be without abiding doubt in determining that the questionnaire incident pointed to deliberate fraud, our conclusions would need be different. We cannot say as much because the resolution to take the oath may well have come from an honest triumph of Bergmann's sincere desires to become a citizen over a perfectly natural revulsion against the idea of bearing arms against kith and kin and native land. This possibility leans too strongly toward the probable to be reversed by Bergmann's rash and bigoted expressions as to current happenings of a considerable period of time after his naturalization. And it is well in this connection to have in mind the uncontradicted testimony as to appellant's generosity toward the municipality of his residence and local institutions of culture. We may add that there is affirmative proof that Bergmann has been a law-abiding citizen.

■ The courts have been meticulous in announcing over and over again that there are not two different sets of rights to be enjoyed by two different kinds of citizens. The constitutional right of opinion together with the right to express it possessed by every citizen would, in truth, become unreal and academic to the naturalized citizen if his citizenship would be cancellable because of opinions held and expressed as to current events happening after his admission to citizenship. No such condition is imposed upon native born citizens. The inference of fraud in procuring the status of citizenship can only be drawn from facts clearly, unequivocally, and convincingly shown to establish the existence of fraud in the taking of the necessary steps toward naturalization. "Citizenship, once bestowed upon proceedings in the federal courts, should not be lightly taken away." United States v. Woerndle, 9 Cir., 288 F. 47, 49.

Our conclusion is that the doctrine expressed in the Schneiderman and Baumgartner cases, both supra, compels reversal of the judgment of the district court.

Reversed.