**Iracema Philippina SIMONS, Plaintiff,**

v.

**UNITED STATES of America and the Estate of John Simons, Deceased, Defendants.**

**No. 70 Civ. 1222.**

United States District Court,
S. D. New York.

May 24, 1971.

Gerald J. McMahon, New York City, for plaintiff; Edward J. Ennis, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., for U.S.A.; T. Gorman Reilly, Asst. U. S. Atty., of counsel.

Guzik & Boukstein, New York City, for Estate of John Simons, Deceased, Leo Guzik, Harris Rakov, New York City, of counsel.

LASKER, District Judge.

The motions here raise novel questions of law in an unusual factual setting. The plaintiff alleges that she and her late, divorced husband obtained their naturalization decrees in this court by fraud. She seeks to have both decrees set aside. The motivation for such an unusual action is apparent from the papers. Despite the observation of Mr. Justice Black that "[n]ot only is United States citizenship a 'high privilege,' it is a priceless treasure," Johnson v. Eisentrager, 339 U.S. 763, 791, 70 S.Ct. 936, 950, 94 L.Ed. 1255 (dissenting) (1950), it seems that the plaintiff here seeks a treasure which she would value more, a share of her former husband's substantial estate in which she may have rights under Dutch law. She apparently does not subscribe to the view expressed in Knauer v. United States, 328 U.S. 654, 659, 66 S.Ct. 1304, 1307, 90 L.Ed. 1500 (1946), that "denaturalization * * * may result in the loss 'of all that makes life worth living.' "

Plaintiff predicates jurisdiction on 28 U.S.C.A. § 1331 (federal question) and § 1346 (suits against the United States).[1] She has also filed contemporaneously herewith two petitions under the file number for the naturalization decrees which she and her husband obtained in 1948, requesting the cancellation of the decrees. So presented, the case raises issues as to (a) the private interests of the plaintiff and the Estate of John Simons, (b) the public interest of the United States in alleged frauds as to the naturalization of its citizens, and (c) the public interest of this court in the validity of its own decree allegedly induced by fraud.

By its motion here, defendant United States of America moves for summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] Defendant Estate of John Si-

---

1. Plaintiff also cites, apparently as a jurisdictional basis, 28 U.S.C.A. § 1361 (see Complaint, end of par. 2). This provision for an "Action to compel an officer of the United States to perform his duty" applies, if at all, in connection with 8 U.S. C.A. § 1451(a), which states that "[i]t shall be the duty of the United States attorneys" to institute denaturalization proceedings on the basis of fraud in connection with the decree of citizenship.
 The Government has replied to this citation at length, apparently construing it to mean that plaintiff seeks to compel the United States Attorney "in the nature of mandamus" under 28 U.S.C.A. § 1361 to sue to vacate her decree. Plaintiff's papers, however, are silent as to the import of 28 U.S.C.A. § 1361 in this suit. At oral argument before this court on September 8, 1970, plaintiff's counsel contended that the attack on the decrees here was a direct attack and that plaintiff was not required to and does not seek an order of mandamus.

 For the reasons herein stated, this direct attack is allowed. The alternative ground for relief, if such it be, under 28 U.S. C.A. § 1361, has not been pressed by plaintiff, is not directed against the United States Attorney for the Southern District of New York, whose duty it would be to prosecute an action under 8 U.S.C.A. § 1451(a), and accordingly it is dismissed without prejudice to plaintiff to raise it against a proper defendant.

2. Defendant United States, although moving only for summary judgment, raises arguments also as to jurisdiction and standing. It urges that (1) an individual suit to compel revocation of naturalization under 8 U.S.C.A. § 1451 will not lie because it is exclusively within the authority of the United States Attorney to bring such a suit, § 1451 is the exclusive procedure for a direct attack upon the validity of a naturalization decree, and the case law before the first Naturalization Act of 1906 makes it clear that prior to its enactment only the United States Attorney or similar public officials could directly attack naturalization decrees; (2) even if private suit is allowed, plaintiff's failure to file an "affidavit showing good cause" as required under 8 U.S.C.A. § 1451(a) necessitates dismissal of this action; (3) even if private suit is allowed, this action is barred because plaintiff is guilty of lach-

mons moves for dismissal of the complaint for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted under Rule 12(b) (1) and (6), F.R. Civ.P.[3] Plaintiff opposes both motions.[4]

## GENERAL BACKGROUND

With the outbreak of World War II in 1939, John Simons fled The Netherlands, where he conducted his family business, Simons Metaalhandel N.V., in Rotterdam. On April 15, 1940, he entered the United States on an immigrant visa arriving from Genoa, Italy, and made a declaration of intention to become a citizen of the United States on January 7, 1941, after having initially filed on July 18, 1940.

John Simons returned to Holland on February 28, 1946. He appears to have been in the employ of an American corporation in going to Europe, although plaintiff alleges that John Simons used the American corporation and others "as subterfuges to enable my husband to return to Holland to rebuild the family concern, 'Simons Metaalhandel' of Rotterdam." (Affidavit of plaintiff, sworn to July 31, 1970).

While in Europe, John Simons married plaintiff on December 23, 1946, in

es; (4) plaintiff has failed to exhaust her administrative remedies by not bringing her claims to the Immigration and Naturalization Service or the United States Attorney; (5) plaintiff cannot attack the naturalization decree of her late husband because she cannot give him the 60 days personal notice required under 8 U.S.C.A. § 1451(b), and to permit attack without such notice violates constitutional due process.

3. Defendant Estate of John Simons, moving for dismissal under Rule 12(b) (1) and (6), F.R.Civ.P., argues preliminarily that plaintiff's suit is brought not for a public purpose, but to circumvent New York law which would recognize a Mexican divorce and prevent plaintiff from inheritance. The Estate then argues that (1) the court lacks jurisdiction since only the United States Attorney can proceed under 8 U.S.C.A. § 1451, and such was the rule even prior to the statute; and further, that any attempt by plaintiff to move under 8 U.S.C.A. § 1451(j) and Rule 60(b), F.R.Civ.P., is barred by the time limitations in Rule 60(b); (2) the statutory bases alleged for plaintiff's jurisdiction (28 U.S.C.A. §§ 1331, 1336, 1361) fail to support the action; (3) plaintiff's claim, even if permitted, is barred by the statute of limitations in 28 U.S.C.A. § 2401; (4) even if permitted, plaintiff's claim is barred because the plaintiff is guilty of laches in bringing her suit; (5) the naturalization of John Simons cannot be revoked after his death, for no personal notice as required by 8 U.S.C.A. § 1451(b) can be given him; (6) even if plaintiff may prosecute this action she lacks standing to do so since she cannot contest the validity of the divorce which she herself obtained (an argument which appears irrelevant here); (7) plaintiff, having enjoyed the benefits of the decrees of naturalization for herself and John Simons for 22 years, is estopped from alleging their invalidity; (8) since plaintiff made the alleged misrepresentations in her own naturalization proceeding and participated in the alleged fraud of her then husband, she is estopped from taking advantage of her own wrongdoing.

On these arguments, defendant Estate of John Simons seeks dismissal with prejudice and costs to be taxed against the plaintiff.

4. Plaintiff opposes both these motions. She argues that (1) this is an independent action for review, filed simultaneously with a petition and application in the original naturalization proceedings, to seek an adjudication that the 1948 decrees of this court are invalid because obtained by fraud; and this court has inherent authority to review and set aside fraudulently obtained judgments, Rule 60(b), F.R. Civ.P., and 8 U.S.C.A. § 1451(j); (2) this is a direct attack on decrees, not a collateral attack, which plaintiff agrees could not be made; (3) interested parties have had standing to make such direct attacks both before the Naturalization Act of 1906 and afterward; (4) no "affidavit showing good cause" is required of a private party under 8 U.S. C.A. § 1451, but only of the United States Attorney in proceedings which he institutes; (5) plaintiff is not barred by the doctrine of laches since, according to plaintiff, defendant United States has been guilty of laches and is somehow or other thereby estopped; (6) plaintiff's claim is not barred by the statute of limitations contained in 28 U.S.C.A. § 2401.

Amsterdam. Both traveled to the United States on January 21, 1947, returning again to Europe on May 20, 1947. The couple again came to the United States on April 23, 1948. On May 5, 1948, John Simons was naturalized as a citizen of the United States (Petition No. 553957 and Naturalization Certificate No. 6706307). On or about May 10, 1948, John Simons traveled to Europe alone. On July 22, 1948, remaining in the United States allegedly at her husband's instructions, plaintiff was naturalized as a United States citizen (Petition No. 568739 and Naturalization Certificate No. 6867228). On August 1, 1948, plaintiff left the United States to join her husband in Europe.

Plaintiff relates that on June 1, 1948, John Simons rented an apartment in Brussels where he and plaintiff resided for four years. During this time John Simons commuted to Rotterdam to conduct the family business. In June of 1952, the family business rented a large estate for the Simonses in Wassenaar, near The Hague. The United States asserts that John Simons and plaintiff "remained in Europe during the period from 1948 to 1964. This was to enable John Simons to carry out his functions as vice president of Hercules Steel Corporation, an American corporation with its headquarters in New York." Throughout this period plaintiff and her husband filed New York and United States income tax returns. (Affidavit of T. Gorman Reilly, sworn to June 30, 1970).

Plaintiff asserts that at no time did she or her husband rent or maintain an apartment in New York, although the United States asserts the contrary, albeit without supporting evidence.

Plaintiff urges that, contrary to the declarations he made in the process of his naturalization, her husband never intended to take up residence in the United States. She claims that her own declarations were similarly false. She alleges this to be the fraud by which both received their naturalization decrees in this court.

Plaintiff initiated a divorce proceeding against John Simons in the Supreme Court of New York County on December 14, 1962, and both she and her husband entered into a separation agreement at the United States Consulate in Amsterdam on January 29, 1964. On February 19, 1964, plaintiff received a decree of divorce and termination of marriage in the District of Bravos, State of Chihuahua, Mexico. The New York Supreme Court action was discontinued April 2, 1964.

The complaint states that the divorce decree "was obtained solely by the threats of John Simons to plaintiff, which plaintiff believed and which forced her consent, that John Simons would kill or injure her or arrange for her confinement in a mental institution if she did not consent to the discontinuance of the New York action and the Mexican divorce." Plaintiff appeared in Chihuahua in person and by counsel to obtain the divorce decree there; John Simons appeared by counsel.

Neither party remarried. John Simons died on November 8, 1968, in Pully, Switzerland. There were no children, and John Simons' estate after a few money bequests was willed to scientific and educational purposes.

The complaint alleges (paragraph 16) that: "Upon determination that plaintiff and John Simons were not lawful citizens of the United States Dutch law will govern their status and the legality of the Mexican divorce between them." Plaintiff's Memorandum in opposition to the instant motions states as "The Purpose of This Action":

"This action is brought by plaintiff as the person directly concerned who has sustained substantial injury resulting from her deceased husband's fraud. Her husband's fraudulent procurement of United States citizenship for himself and for the plaintiff, and the Mexican divorce decree secured as a result of the husband's duress and undue influence upon plaintiff have deprived the plaintiff of substantial

property rights to which she is entitled as a Dutch national."

## JURISDICTION

■ Defendants contend that 8 U.S. C.A. § 1451(a) is an exclusive method to attack naturalization decrees, that only the United States Attorney is authorized to sue under its provisions, and that a court's inherent power to correct its decrees is limited by the statute, as indeed, it is argued, it was limited even before the statute. An exhaustive exploration of the history of denaturalization proceedings and a review of the present state of the law lead us to find that defendants' position lacks merit.

Prior to the first federal effort to codify the law of naturalization pursuant to the constitutional authority in Article I, § 8, cl. 4, "to establish a uniform Rule of Naturalization," the authorities are contradictory as to who had the right to challenge naturalization decrees.[5] The court's jurisdiction appears to have been assumed, and the real issue was who had standing to raise the matter.

Section 15 of the Naturalization Act of 1906 provided that "it shall be the duty of the United States district attorneys" to initiate denaturalization proceedings.[6] Although on balance the au-

5. Representative cases and commentary on the law prior to 1906 can be adduced both for the proposition that only the Government could initiate denaturalization decrees, and for the opposite contention that interested parties may so act.
A. Cases for the proposition that persons other than the United States may attack a naturalization decree include: In re McCoppin, 15 Fed.Cas. p. 1300 (No. 8,713) (C.C.Cal.1869), in which Mr. Justice Field, sitting as Circuit Justice, entertained the petition of the Mayor of San Francisco to determine whether or not his naturalization was valid. In upholding validity of the naturalization, he stated:
"Undoubtedly, the court might, in a proper case, set side its judgment admitting a party to citizenship, if the party was not at the time entitled to admission, and the court had reason to believe that it had been intentionally deceived."
B. There are more cases which hold that the Government alone may attack a naturalization decree. See Pintsch Compressing Co. v. Bergin, 84 F. 140 (C.C., D. Mass.1897), McCarran v. Cooper, 16 App. Div. 311, 44 N.Y.S. 695, 696 (1st Dept. 1897), and Commonwealth v. Paper, 1 Brewst. 263 (Pa.1868). In the latter case a group of citizens sought to have vacated the naturalization decrees of some 20 persons on the ground that they were obtained by fraud. The Court granted their petition only on the condition:
" * * * that the Attorney-General [of Pennsylvania] shall appear on the record to prosecute the rule. One citizen cannot impugn the action of a Court in naturalization cases so far as to require the cancellation of naturalization papers. Some public authority must do this."

See also Moore, 3 Int'l L.Digest § 422 (p. 500) (1906); United States v. Mansour, 170 F. 671, 675 (and cases and documents cited therein) (S.D.N.Y.1908); United States v. Zucca, 125 F.Supp. 551, 553 (S.D.N.Y.1954).
C. Commentators point to the lack of a uniformly followed rule during the period prior to 1906. The confusion in the law reflected a confusion of policy generally in the field of naturalization. See J. Roach, "Pre-Statutory Denaturalization," 35 Cornell L.Q.Rev. 120 (1949); R. L. Morrow, "The Early American Attitude Toward Naturalized Americans Abroad," 30 Am.J.Int'l L. 647 (1936). See also note 3, Bindczyck v. Finucane, infra, 342 U.S. 76 at 79–80, 72 S.Ct. 130, 96 L.Ed. 100.

6. Section 15, 34 Stat. 596, 601 (1906). Many of the difficulties as to who may directly attack naturalization decrees are derived from the lack of clearness in the provision making it the "duty" of the United States Attorney to do so. The legislative history is not clear as to whether this provision was intended to be exclusive or not. It is true that Attorney General Wickersham said in 1909 that § 15 "is construed to be remedial rather than penal in its nature; for the protection of the body politic rather than for the punishment of the individuals concerned,"—but this elucidation does not take us very far. Instructions as to Naturalization Matters, Department of Justice Circular Letter No. 107, Sept. 20, 1909, cited in J. Roach, "Statutory Denaturalization: 1906–1951," 13 U. of Pittsburgh L.Rev. 276, 304 (1952). However, while § 15 may have been intended to limit direct attacks to those brought by

thorities appear to support the conclusion that this authorization was to be the exclusive means to attack naturalization decrees,[7] there were occasions when the courts permitted direct attacks on such decrees by others.[8]

Section 15 was subsequently re-enacted as § 338(a) of the Nationality Act of 1940.[9] The same language was used with the same resulting ambiguities. The issue of whether or not the authority given the United States Attorney was exclusive was finally determined in Bindczyck v. Finucane, 342 U.S. 76, at 83, 72 S.Ct. 130, 96 L.Ed. 100 (1951), where, the Court held that § 338(a) was a "self-contained, exclusive procedure."

This holding in *Bindczyck* was specifically abrogated by § 340(j) of the Immigration and Nationality Act of 1952: [10]

"Nothing contained in this section shall be regarded as limiting, denying,

---

the United States Attorney in the public interest, such attacks initiated by others did not cease. As Roach has observed, "The denaturalization provision [§ 15] was neither elaborate nor carefully drawn." (*Id.* at 287).

7. J. Roach, "Statutory Denaturalization: 1906–1951," supra, at 288, note 55:
"[The United States attorney may institute denaturalization proceedings of his own volition] Schwinn v. United States, 112 F.2d 74 (9th Cir. 1940), aff'd 311 U.S. 616, 61 S.Ct. 70, 85 L.Ed. 390 (1940); United States v. Schuchhardt, 48 F.Supp. 876 (N.D.Ind.1943). The original interpretation of the statute was that the United States attorney was the only person who could institute denaturalization proceedings. United States v. Anderson, 169 F. 201 (D. Idaho 1909). But in 1918 the naturalization laws were amended to allow the Commissioner or Deputy Commissioner of Naturalization to enter suit on behalf of the United States under Section 15. See 40 Stat. 544 (1918). However, this latter authorization was deleted from the law in 1940, see 54 Stat. 1158 (1940), 8 U.S.C.A. § 738 (1942). Presumably [through 1951], the United States attorney is now the only person qualified to institute such actions."
See also Kansas, Immigration and Nationality Act Annotated, at 49 (1953).

8. See, e. g., In re Macoluso's Naturalization, 237 Pa. 132, 85 A. 149 (1912), where a candidate for political office directly attacked the citizenship of his opponent, who derived his status derivatively from his father (then deceased), who was naturalized while the candidate attacked was a child. The Pennsylvania Supreme Court held that the state court retained jurisdiction over the possible fraudulent citizenship of the father even though deceased.
See also Petition of Weltzien, 68 F. Supp. 1000, 1002 (S.D.N.Y.1946);

Schwinn v. United States, 112 F.2d 74, 76 (9th Cir. 1940).

9. 54 Stat. 1137, 1158.

10. 66 Stat. 163, 262. Codified at 8 U.S. C.A. § 1451(j) and cited herein throughout as § 340(j). The earlier part of this section, 8 U.S.C.A. § 1451(a), appeared in substantially the same content as § 15 of the 1906 Act and § 338(a) of the 1940 Act. Section 340(j) did not appear in the initial drafts of the 1952 legislation S. 2550 and H.R. 5678, although what is now 8 U.S.C.A. § 1451(a) did. The Conference Report on the legislation, No. 2096 to accompany H.R. 5678, June 9, 1952, included § 340(j) for the first time.
Legislative history is scarce regarding this provision. No discussion appears in 98 Cong.Rec. other than the reporting of the entire Conference bill at 6947–86 (§ 340(j) appears at 6980). The Conference Report was accepted at 6991. 1952 (Vol. 2) U.S.Code Cong. & Admin.News (82nd Cong.—2nd Session) contains no mention as to the intent, e. g., 1679, 1741.
Enactment of § 340(j) was received by commentators as a rejection of so much of Bindczyck v. Finucane, supra, 342 U.S. at 83, 72 S.Ct. 130, as held that the United States Attorney was the sole party authorized to attack a naturalization decree. See Note, "Recent Developments —Affidavit of Good Cause Prerequisite to Civil Denaturalization Proceeding," 55 Columbia L.Rev. 751, 753 (note 21) (1955); L. Hambro, "Comment, Constitutional Law—Denaturalization Under the Immigration and Nationality Act of 1952," 51 Mich.L.Rev. 881, 901 (1953). Note, "Developments in the Law of Immigration and Nationality," 66 Harvard L. Rev. 643, 718–19 (1953), comments as follows:
"The 1952 Act destroys the authority of this decision [Bindczyck v. Finucane, supra] by providing that a court may 'correct, alter, modify, or vacate its

or restricting the power of any naturalization court, by or in which a person has been naturalized, to correct, reopen, alter, modify, or vacate its judgment or decree naturalizing such person, during the term of such court or within the time prescribed by the rules of procedure or statutes governing the jurisdiction of the court to take such action."

The Supreme Court took cognizance in United States v. Zucca, 351 U.S. 91, 95, 76 S.Ct. 671, 674, 100 L.Ed. 964 (note 8) (1956), that § 340(j) constituted a legislative mandate overruling *Bindczyck* in certain respects:

"The specific holding, that § 338(a) of the 1940 Act overrode local rules concerning time limitations upon the power of state courts to reopen their judgments, was abrogated by § 340 (j) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 262."

This view of the effect of § 340(j) of the 1952 Act appears equally applicable to the prior *Bindczyck* holding that § 338(a) was a "self-contained, exclusive procedure."

By the explicit language of § 340(j) we are directed to look to the rules and statutes governing the jurisdiction of the court.[11] Rule 60(b), F.R.Civ.P., now guides the exercise of this court's authority to modify its judgments. Rule 60(b) states:

"This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, * * * or to set aside a judgment for fraud upon the court."

Thus the rule does not limit this aspect of the court's "inherent power to set aside a judgment for fraud practiced upon it." 7 Moore's Federal Practice ¶ 60.-16[5], p. 89 (1970 Ed.). More specifically, it provides that within a reasonable time "[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for * * * (6) any other reason justifying relief from the operation of the judgment."

Rule 60(b) further provides that "the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action." Here, plaintiff initiated such an independent action. Her applications filed under the original decree numbers are surplus.

Just as Rule 60(b) alone has been applied to challenges to denaturalization decree, see, e. g., United States v. Kunz, 5 F.R.D. 391 (S.D.N.Y.1946), aff'd 163 F.2d 344 (2d Cir. 1947); United States v. Karahalias, 205 F.2d 331

judgment * * * during the term * * * or within the time prescribed by the rules of procedure or statutes governing the jurisdiction of the court * * *' Thus it appears that Congress does not consider the exercise of such power to be inconsistent with statutory denaturalization. Both this procedural power and the right of appeal seem inherent in the jurisdiction of a court, and as long as naturalization proceedings are properly brought in state courts, local rules of procedure should apply. The possibility of abuse is limited; the right to vacate is restricted in time and the motion can be brought in the court where citizenship was granted. Furthermore, in the hearing on the motion the Government would have the burden of proof as in denaturalization." [Footnotes omitted.]

11. For a discussion of the court's inherent authority prior to Rule 60(b) see Zimmern v. United States, 298 U.S. 167, 56 S.Ct. 706, 80 L.Ed. 1118 (1936). Since the enactment of § 340(j) directing the court's attention *inter alia* to Rule 60(b), the holding of United States v. Candela, 131 F.Supp. 249 (S.D.N.Y.1954), relied upon by the defendants here, is not controlling. Nor is MacKay v. McAlexander, 268 F.2d 35, 38 (9th Cir. 1959), controlling, for there the plaintiff made a collateral attack on a Canadian naturalization decree and dismissal was properly made on facts quite different from those of the instant suit.

(2d Cir. 1953); Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949), so also the same rationale supports recourse to the rule in challenging a naturalization decree under Rule 60(b) and § 340(j). "Thus it appears that Congress does not consider the exercise of such power to be inconsistent with statutory denaturalization." Note, "Developments in the Law of Immigration and Nationality," 66 Harv.L. Rev. 643, 718 (see also 717–19, 728–31) (1953).

As was stated in In re Campbell's Petition, 326 F.2d 101, 102 (2d Cir. 1964):

> "Section 340(j) is a grant of power to the court to reopen its naturalization judgments and is stated in permissive terms. It is well settled that motions for relief under Rule 60(b) are addressed to the discretion of the court. Fischer v. Dover S.S. Co., 218 F.2d 682 (2d Cir. 1955); England v. Doyle, 281 F.2d 304, 309 (9th Cir. 1960)."

See also Polites v. United States, 364 U.S. 426, 81 S.Ct. 202, 5 L.Ed.2d 173 (1960).

Accordingly, it is clear that this court has jurisdiction over the action here under its inherent authority to vacate a decree if obtained by fraud on the court. Furthermore, if plaintiff can show that she has sued within a reasonable time, jurisdiction may also be founded upon the "other reason" clause of Rule 60(b) which "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." Klapprott v. United States, supra, 335 U.S. at 614–615, 69 S.Ct. at 390.[12]

This court awarded the naturalization decrees attacked by this proceeding. On the basis of the discussion above, we hold that jurisdiction over such matters vests in this court pursuant to § 340(j), Rule 60(b) and 8 U.S.C.A. § 1421, and accordingly the motions to dismiss for lack of jurisdiction are denied.[13]

## STANDING

Having established jurisdiction, it is necessary to inquire whether

12. Plaintiff has not discussed the reasonableness of the time at which this action is brought except in connection with the issue of laches not treated here. As alternative grounds to support her position, plaintiff invokes clauses 1 through 3 of Rule 60(b). Because relief under clauses 1 through 3 is limited to a period of one year after the granting of a judgment and more than a year has passed since the granting of the decrees here, the protection of these clauses is not available. While plaintiff may contend that this court has authority to extend the time limits of Rule 60(b) (one year under clauses 1 through 3 and a reasonable time under clauses 4 through 6), citing as authority Braniff Airways, Inc. v. Curtiss-Wright Corp., 424 F.2d 427 (2d Cir. 1970), we do not reach this question. We determine only that this court under Rule 60(b) always has jurisdiction to inquire into judgments allegedly obtained by fraud. A naturalization decree has long been held to be such a judgment. Tutun v. United States, 270 U.S. 568, 576, 46 S.Ct. 425, 70 L.Ed. 738 (1926).

13. The Government's additional contention that "The provisions of § 340(j), 8 U.S.C.

§ 1451(j), hardly apply here where the naturalization decrees were entered in 1946" (Reply Memorandum of Defendant United States of America at 12, note 5) is without merit. 8 U.S.C.A. § 1451 (i) specifically provides that the entire section (§ 1451) applies "to all certificates of naturalization and citizenship which may have been issued heretofore by any court or by the Commissioner based upon naturalization granted by any court, * * *" Rule 60(b) does not contain limits as to what judgments it governs. The shallow, if not hasty, treatment which the Government's arguments present is further evidenced by its statement that only a "very few students of this subject" of denaturalization exist. (Id. at 3, note 3), when in fact the field has been reasonably thoroughly treated as the annotations in the text and notes of this opinion indicate. It is in part perhaps the posture of placing the Government as a defendant when usually it is the plaintiff in statutory denaturalizations which generates the unsatisfactory treatment here.

plaintiff has standing to sue. We have dealt above with defendants' contentions that under 8 U.S.C.A. § 1451(a) plaintiff has no standing. However, reference to 8 U.S.C.A. § 1451(a) is misplaced because plaintiff does not rely on that section, and her failure to file the affidavit required by that section or to undertake administrative steps which might invoke the provisions of that section does not bar her from proceeding under § 340(j) and Rule 60(b). Parties other than the United States Attorney may invoke § 340 (j) and Rule 60(b), see, e. g., Petition of Taulapapa, 282 F.Supp. 156 (D.Hawaii 1968), where the motion was made by the Immigration and Naturalization Service.

 Under the Supreme Court's most recent decision on the subject, a party may be found to have standing where he has been caused an "injury in fact" and where his injury "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service v. Camp, 397 U.S. 150, 152, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). It is also necessary that the party have "the personal stake and interest that impart the concrete adverseness required by Article III." Barlow v. Collins, 397 U.S. 159, 164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970). The latter issue, as it relates to naturalization, has been determined in Tutun v. United States, 270 U.S. 568, 577, 46 S.Ct. 425, 427, 70 L.Ed. 738 (1926), where Mr. Justice Brandeis stated for the Court:

"Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution, whether the subject of the litigation be property or status. A petition for naturalization is clearly a proceeding of that character.

"The petitioner's claim is one arising under the Constitution and laws of the United States. The claim is presented to the court in such a form that the judicial power is capable of acting upon it. The proceeding is instituted and is conducted throughout according to the regular course of judicial procedure. The United States is always a possible adverse party * * The judgment entered, like other judgments of a court of record, is accepted as complete evidence of its own validity unless set aside."

 Certainly plaintiff shows sufficient injury in fact to give her standing, assuming, for the purposes of the motion to dismiss, the truth of plaintiff's allegations that she obtained her naturalization under duress of her husband, that neither she nor he ever intended to reside in the United States and never did in fact reside in the United States after having been naturalized, that her husband forced plaintiff to obtain a Mexican divorce and disinherited her, and that under Dutch law (the nationality of the couple prior to nationalization as United States citizens) the Mexican decree would not be recognized and as surviving spouse plaintiff would have rights in her late husband's estate.

Moreover, as the recipient of her own naturalization decree plaintiff certainly has sufficient interest in its validity, both as plaintiff and petitioner here, to challenge the validity of that decree, however untoward the attack may appear. As to the attack on her husband's decree, just as the spouse or children of a naturalized citizen have standing to attack the validity of a denaturalization decree against their relative, so here this wife has sufficient standing to attack the decree of her husband. This is so even though her husband has died. While the Government may see no public purpose in attacking the decrees of deceased persons even though grounds for such action may appear, see Hackworth, III Digest of International Law 101–2 (1942), its determination is not controlling as to the private interests of an individual.

 The private status of deceased individuals has been the subject of legal

actions by their survivors in different fields of law. For example, In re Macoluso's Naturalization, 237 Pa. 132, 85 A. 149 (1912), involved the alleged fraudulent naturalization certificate of a deceased person. Status of individuals after their death, for instance as to domicile, has been at issue in other fields of law including application of death taxes, construction of wills, probate of estates, establishment of the domicile of the wife after her husband's death, and in other matters such as wrongful death actions. The defendants offer no argument why the plaintiff should not have standing to attack her late husband's decree other than that certain provisions of 8 U.S.C.A. § 1451(a) and (b) cannot be properly complied with after the naturalized person has died. Such arguments are not material in the case of a complaint under § 340(j) and Rule 60(b).[14]

The finding that plaintiff has standing here is further buttressed by the argument that in the provision of Rule 60(b) that "[o]n motion * * * the court may relieve a party," the word "party" should be construed to mean "a person whose legal interests are affected by the judgment to an extent sufficient to confer standing in an independent action in the federal courts." Note, "Use of Rule 60(b) to Vacate Federal Denaturalization Decrees," 10 Stan.L.Rev. 767, 768 (1958).[15] Where a party's rights are affected by a naturalization decree there appears to be no reason why the same construction should not apply.

In sum, plaintiff's standing emerges from her personal interest in the decrees. The fraud alleged to underlie both decrees is inextricably linked, and the same elements of injury in fact and a controversy within the scope of the Immigration and Nationality Act of 1952 are present as to both decrees. Plaintiff's stake is different from the interest of the United States Attorney under 8 U.S.C.A. § 1451(a) and his duty to vindicate the public interest. Of course, both plaintiff's attack and the statutory denaturalization which the United States Attorney has authority to initiate raise the question of a fraud upon the court, and both serve a public interest to the extent that both permit inquiry by the court into the validity of its own decree. But the interest upon which standing here is based is plaintiff's private stake in the decrees.

## ■ EQUITABLE BARS [16]

"To decide the case we need look no further than the maxim that no man

---

14. Even if relevant, the defendants' contentions that to permit such a suit after the death of a naturalized citizen would deny him his rights to 60 days notice under 8 U.S.C.A. § 1451(b) do not compel a contrary result as to standing. At the outset it is clear that the rights of plaintiff's husband are being most competently represented here by his Estate. 8 U.S.C.A. § 1451(b) provides 60 days personal notice "in which to make answers to the petition of the United States." It does not speak of rights under a proceeding by way of § 340(j) and Rule 60(b). As in In re Macoluso's Naturalization, supra, 237 Pa. 132, 85 A. 149, the certificate (or equally, as here, the decree) of a deceased naturalized citizen is subject to attack after his death. The attack may determine the rights of those living. Additionally, the court has an interest in frauds alleged to have been perpetrated upon it. In *Macoluso* it was said that "the court had the authority to prevent the continued fraudulent use of its seal by requiring the surrender of the certificate of naturalization which was a forgery and not authorized by a judgment or decree of the court." *Id.* at 85 A. 150.

15. See also in this regard Association of Data Processing Service v. Camp, supra, 397 U.S. at 153, 90 S.Ct. at 830, where the Court states:
"The 'legal interest' test goes to the merits. The question of standing turns on the finding of a case in controversy and the nature of the interest sought to be protected.

16. The statutory argument that this suit is barred by 28 U.S.C.A. § 2401 is without merit. The action here is governed by Rule 60(b) and its provisions as to time, not by 28 U.S.C.A. § 2401 and its statute of limitations for claims against the United States. *Cf.* United States v. Hauck, 155 F.2d 141, 143 (2d Cir. 1946); United States v. Brass, 37 F.Supp. 698 (E.D.N.Y.1941).

may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts * * *'" Glus v. Brooklyn Eastern Terminal, 359 U.S. 231, 232–233, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959).

"It is a principle of the widest application that equity will not permit one to rely on his own wrongful act, as against those affected by it but who have not participated in it, to support his own asserted legal title or to defeat a remedy which except for his misconduct would not be available. [citing cases]." Deitrick v. Greaney, 309 U.S. 190, 196, 60 S.Ct. 480, 483, 84 L.Ed. 694 (1940).

█ Even if plaintiff originally secured her citizenship under duress, she has since then voluntarily enjoyed the fruits of her citizenship for some 23 years. She has availed herself of United States Consular services abroad, has entered New York State courts, presumably has traveled with an American passport, and admits that she paid New York and federal income taxes for the purpose of avoiding higher Dutch taxes. She may well have lacked intention to reside in the United States permanently and may well have secured her citizenship by fraud. However, insofar as she seeks a personal benefit by taking advantage of her own fraud and seeking to reject her citizenship at this time, we hold that she is estopped from doing so.

## PUBLIC INTEREST ISSUES

Insofar as plaintiff's application and suit seek to vindicate the public interest in protecting decrees of this court from fraud and in assuring that United States citizenship shall not be conferred upon persons by fraud, serious questions have been raised.

█ It is the express duty of the United States Attorney to investigate such alleged frauds and to institute denaturalization proceedings pursuant to 8 U.S.C.A. § 1451(a). Certainly the facts alleged here warrant such an investigation.

█ Whether this court ought to exercise its jurisdiction and entertain an exploration of the alleged frauds in this action is doubtful. Estopped by her own alleged fraud, the plaintiff is not particularly well suited to vindicate the public interest. Defendant Estate of John Simons, which may be restrained by the same equitable considerations as would apply to Simons were he alive, Christensen v. Felton, 322 F.2d 323, 327 (9th Cir. 1963), seeks to prevent inquiry into the fraud in its own interests. The Government's posture as a defendant here is awkward, rendering it poorly equipped to vindicate the public interest.

On these considerations, the instant action is not the best means for determination of the public interest issues raised. Jurisdiction under Rule 60(b) is discretionary, that rule providing that the court "may" relieve a party from the effect of a decree. See 7 Moore's Federal Practice ¶ 60.19 (p. 222) (1970 Ed.). Accordingly, the court declines to exercise jurisdiction over the public interest issues as they have been raised here.

## CONCLUSION

Having determined that the plaintiff is estopped from proceeding here and declining to exercise jurisdiction over remaining issues, it is not necessary to reach the other arguments of the parties.[17] Defendants' motions are denied. The court dismisses this action *sua sponte*.

It is so ordered.

17. Notes 2–4 supra.